a Mr. DeLeon. May it please the court. My name is Reuben DeLeon, representing Springboards. During my time before the court, I'd like to discuss the distortion by HISD of the phrases in commerce and commercial use, which led to the erroneous decision by the district court. And the evidence that the district court had before it that was sufficient not only to defeat defendant's summary judgment motion, but to allow it to grant summary judgment in favor of Springboards. I would also like to state that all the cases that we have cited, as well as the opponent has cited, does not say that a non-profit cannot infringe on a trademark. It only says that certain activities will not constitute infringement. As to the first issue, confusion of definition of commercial use. HISD represented Springboards' legal arguments that were based solely on in-commerce use, which obviously is a jurisdictional predicate to any law passed by Congress under the Commerce Clause. Because of HISD's misrepresentation, district court appears to have ignored HISD's use of the marks was in connection with a sell, offer for sell, distribution, or advertising of any goods or service on our connection to, of which use, of such use, rather than simply use in commerce. There's a lot of attention made that the teachers and ISDs gave it away, gave away the products. But that's not the, that is not the only way you can infringe on a trademark. Any, like I stated before, in connection with any sell, offer for sell, distribution, advertising or goods or service in the connection with such use. I'd also like to point out some examples of HISD's commercial use. First of all, they bought a lot of products from a third party. There were products that contained the Springboards marks, the trademarks. All the trademarks have to do with reading programs, reading incentive programs. And so the crux of the trademarks are read a million words, trying to incentivize kids to read more. And HISD points out later, I mean, points out that, I'll get back to it in the argument, but they were very successful in summer reading programs because they wanted to make sure that the students didn't fall, you know, didn't fall behind in that summer lag that people talk about all the time when the kids are away from school. So they gave away the incentives for the students to keep reading and excelled at it. And I'll go into an argument later on that too. But OK, going back to the Augusta products that contained the Springboards marks. You had an action against them, right? I'm sorry? You had an action against them? Yes, we did. And we settled with them. But a similar antitrust action? The trademark. I was going to get into that because HISD bought them from Augusta. But HISD didn't turn around and try to sell them to anybody else. They just used it. That would be like me going to buy a T-shirt with your mark on it from a third party. Well, why am I liable? Because I buy a T-shirt from a third party with your mark. Yeah, but also when you go out and try to get somebody to make that for you, when you issue a purchase order or a request for... For my own use. For my own use. Yeah, you're asking them to use somebody else's other trademark. Where's the basis for confusion in the market if I do that and I just use it and give it to my kids to use? Where's the basis for confusion? Well, the confusion in the market itself is a lot of the teachers of the ISD, and we've shown evidence that they all attended the same conferences that my client did. And during those conferences, my client advertised his goods and services, which were the Millionaire Reader program and all the incentives. Well, I think it's odd that they didn't, that they copied exactly the same color schemes, the same wording, the same program. Were teachers authorized to buy your client's products directly? Yes. Well, it usually goes through the librarian. Yeah, but they would be authorized to, or the school district would, but it usually goes through the librarian, I think. Does the librarian, can he or she do it without the authorization from somebody in HISD? I'm not sure how the authorization goes through, but, I mean, the librarians act for the school, for the school district. I mean, you know, it's a vicarious liability. My point was, how does that create confusion in the market? Well, some of these students, or some of the students actually go to the conferences, too. We have a lot of— When we talk about confusion in the market, what does that mean? What market are we talking about? The teachers, the parents, and the students. That's what the law is talking about? I thought the confusion in the market meant potential consumers or purchasers of your client's products. Right. The teachers usually buy them, or the librarians usually buy the products and give it out to the parents and the students. My point is that typically the teachers, at least the parents and students, don't buy the products directly from your client. So if they're confused, that's not confusion in the marketplace? No. Okay. What's the evidence on how many purchasers who would otherwise have purchased from your client were confused by HISD's use of your trade? Well, to me that's a fact issue that we never got to. What's the evidence? There's got to be some evidence. We do have some evidence in the summary judgment motion. What is it? We do have some letters of confusion. What is it? Tell me. What is it? It's a declaration. What does it say? When you compare the two marks, or the marks in their products... Who got confused? Where was the potential or actual confusion? I think it was the librarian, but anybody that attends the conferences would say it's exactly the same thing. And those people that go to the conferences are the consumers, or the librarians and the teachers that buy those products. And so... I do have some words on the actual confusion. The likelihood of confusion is irrefutable. As discussed in the reply, our reply brief, after discussing the digits of confusion, the likelihood of confusion between the HISD marks and the manner in which they were used established the likelihood of confusion with the Springboard's marks. I can look it up later and put it back. It's in our reply brief. Okay, so let's go back to... Okay, the Augusta products, we've talked about that. And we also, I think this is very important, the effects on Springboard's revenue. One of the librarians that we approached earlier, and of course this is not on the record, but this is just the attitude that some of them had, is that, why should we buy your products when we can make them ourselves? I mean, why are you going to make them the exact same thing, the exact same color schemes, the exact same incentives as ours, and say that's not infringement, or that's not, that's right. Anyway, that was just some of the attitude we had from some of the librarians. And that's why they didn't buy them, because they just made them themselves. And HISD did make some of them themselves, too. And we do have evidence of that in the complaint, of some signs and everything that's exactly the same thing that is the Springboard's marks, it covers Springboard's marks. Okay, but the effects on Springboard's revenue. The second most obvious evidence of HISD's use of the marks in connection with a sell of goods or services was the effect HISD had on Springboard's revenue. It's undisputed that Springboard is the exclusive owner of all the rights to the marks. Thus, HISD's use of the infringing materials have impacted and interfered with commerce in that it disrupted Springboard's sell of materials, including its literacy, promotion, goods and services that sold to school districts under the protected names Million Dollar Reader, Millionaire's Reading Club, Millionaire Reader, and Read a Million Words. Don't just read us your description. It makes it hard to stay with you if you're just going to read us the narrative. I mean, just kind of talk to us. You know your case well. I know you do. Don't be nervous. Just kind of help us through it. We've read all your briefs and so on and so forth. We're just trying to get a good grip on as the point was raised about the confusion. The other side says, well, they never heard of your enterprise. It's a small geographical area limited to where you're located, their big HISD, the biggest districts in the country, et cetera, et cetera. And they say nothing magic about the term millionaire. So they have these products, et cetera, et cetera. So we're trying to fit this within the cases that we have that deal with trademarks. So help us. The district court disagreed. So help us with the legal issues here. A confusing issue sometimes is that we're not claiming the exclusivity of using millionaire. Only with millionaire reading or millionaire reader or millionaire reader club because the millionaire reader, I believe, is uncontestable because we've been using it for five years and didn't abandon it. So it's termed invalidated. So anyway, so that goes to the strength of the marks because it is uncontestable. But it's also the strength of the marks goes to, it's not descriptive. Although we're not trying to protect in a descriptive way. You can tell your kids, hey, it's great to read a million words. That's fine. Tell them that. Or you can even describe it in literature. But only when you use our trademarked words exactly the same order or confusedly so. So that's what it comes down to is we're only saying that don't use our, there's tons of ways to incentivize kids to read. But why do you have to use ours? Oh, because you saw it in a conference, because your teachers went there, and because you know it's very successful. And we do have a deposition from their side that we took that said that their program, their summer reading program was very successful and actually raised reading scores. And that's why they kept on doing it, I presume, since it wasn't very successful. Was there evidence in the record through depositions or declarations or whatever that connects the HISD personnel, librarians, teachers, or whomever, into the places and spaces where your product was marketed so you kind of make the causal connection, notwithstanding what they say? I'm sorry? Do you understand what I'm saying? I'm saying is there evidence in the summer judgment record through declarations or depositions of HISD personnel that connect their use of Millionaire Reading Club with your product? Yes, sir. There's some in the complaint, and there's some through depositions that we've taken. Now I can't say it's all on the record of appeal, because that was just the motion for summery judgment that were on there, not all the evidence that was entered, not all the evidence that we would present to trial. And so really all we want to do is get to trial and present all our evidence. We think there's lots of fact issues here. And the holdup that I think Judge Hittner had was defining nonprofits as you had to sell something in order to infringe. Well, you don't have to sell something. First of all, if you give it away, it's taking away from our client's slaveryhood. You can't just make up some other guy's trademark or say you can't sell Coca-Cola products or even give them away and say Coca-Cola because it's infringing on their trademark. The whole concept of trademarks is origin of goods, quality of services. Well, these were inferior copies, because although it said the same word, but they weren't made very well, our client takes a lot of pride in his quality. And some of the stuff that they were just poor quality. And so it tracks from our client's trademarks and their quality. So that's kind of what it's about. But the big thing is, like I said, it's only all the cases that they cited and we cited do not say that nonprofits cannot infringe. They only say that nonprofits, if they do certain activities like parodies, criticizing, or just describing somebody's goods or somebody's trademark is okay, because you're not competing against them. They were competing against us because they made them themselves instead of bought it from us. And it's the exact same thing. And we got those trademarks on it. And then they distribute it to the kids. Now, another problem that I think Judge Hittner had was the whole concept of ISDs or any charter schools, because they're funded by the taxpayer. And so that makes them a nonprofit. But I mean, just because they gave away the services, they gave away these products, is saying the same thing. I mean, then that's not commercial use. That's saying the same thing as those teachers. They get paid. I mean, but can they infringe? Can they? I mean, the whole concept, I think, is just. All right, Mr. Daly, I'm going to stop you mid-sentence there. You're sort of on a roll there. But you've preserved your rebuttal time. Let's hear from Mr. Spivey. When you come back up, you can pick back up there. Thank you. Thank you. May it please the court. My name is Jonathan Spivey, and I'm here to represent Houston Independent School District. And I'll just refer to it shorthand for HISD. Now, HISD has a dramatically different view from that of appellant regarding the issues before the court. In particular, the lower court did not err in granting HISD's motion for summary judgment and did not err in denying appellant's cross motion for summary judgment. The reason for that is simple. Appellant failed to raise a genuine issue of material fact that HISD engaged in commercial use of appellant's trademarks. Now, likewise, the lower court did not abuse its discretion in denying appellant's motion to reconsider the summary judgment rulings. It also moved to amend the time frame of the summary judgment motion. The court did not abuse its discretion in denying that motion. Well, let me stop you there. One of the pressure points seems to be counsel is arguing that the district court did rely on, you know, the commercial use aspect. And his argument, at least as I understand it, is that that was incorrect as a matter of law because there being no commercial use in order to establish his claim. And saying as much, though HISD gave the products to the students, etc., no commercial use in the normal sense. In other words, he doesn't have to show an economic use, so to speak, in order to make his claim. So that's, at least as I understand it, one point of dispute here in the way he's raising it on appeal. And he says if we determined the district court was wrong on that legal point, then HISD was not entitled to summary judgment as a matter of law, not getting on the fact part. That's my shorthand way of at least understanding. So start with the Yes. Appellant doesn't argue and cannot argue that the Lanham Act claims don't require a showing of commercial use because they do. It requires a sale in connection with a sale or good of using They did buy goods. I mean, they did buy goods, and they directed that the manufacturers put a trademark on those goods. Surely. Why isn't that commercial use? HISD did engage in a purchase of a good, and there was only five purchases from Augusta for our banners that HISD could not print in its own print shop. And the mark that was on there was not the appellant's mark. It is none of the appellant's marks because the HISD mark that it uses was not the appellant's mark. Well, cut off the HISD. Let's suppose I'm HISD, and I provide free school lunches to lots of kids, and they like Coca-Cola. And HISD says, well, look, I can go create my own Coca-Cola that's advertised on TV with the fizzer thing, make it and Coca-Cola cups. Is that a trademark infringement? Well, you have to have it in connection with a sale or a good that encompasses the mark of the trademark code. If you don't have anything in connection with the sale or a good that encompasses the trademark code. Well, they're representing to consumers, at least, kids, that this is the real Coca-Cola. It doesn't taste as good as the real Coca-Cola. Why isn't that a trademark infringement? I would suggest that that is more of a trade secret if they're representing that it tastes like the real Coca-Cola. They just represent it as Coca-Cola. And the kids taste it and they say, you know, this Coca-Cola is bad. It's not as good as it used to be because they don't know it's not Coca-Cola. It looks like Coca-Cola to them. Again, in connection with the sale of a good or service. If they're not selling anything that has the... Forgoing buying real Coca-Cola in the market and creating their own Coca-Cola and selling it labeled, I mean, giving it to their, using Coca-Cola's cups, logos, trademarks in lieu of buying it from Coca-Cola. If they are selling it, a good or a service, in connection with the mark of the trademark holder. Well, they're distributing it. They're certainly distributing it. Again, I'm just reading what the statute requires. I thought the statute said distributing. It says alone distributing, but that distributing means that it's got to be in connection with the sale of a good or the distributing of the trademark holder's mark. If you're not distributing for commercial purposes, commercial use, the trademark holder's mark, there is no Lanham Act violation. Now, in that example that you've given, if the school district was making a T-shirt that included their mark and they sold that mark... But it has to be in connection with a good or a service and it has to be sold or offered for sale in order for it to fall under this commercial use requirement of the Lanham Act. The statute is clear about that. What an appellate does is it misplaces its focus on an opposite jurisdictional requirement of use in commerce that speaks to Congress' Commerce Clause authority to enact the Lanham Act. But that's not an issue here and does not address whether HISD engaged in commercial use. Instead of addressing the commercial use, however, appellate can try to conflate this dispositive issue with a different requirement that the trademark be used in commerce. Now, appellate takes the position that a tangential connection to commercial activity somehow establishes the commercial use requirement under the Lanham Act. That position is contrary to other circuit court rulings and has not been before this court. And for instance, the Ninth Circuit in Bosley determined that a website that allowed users to reach advertising through an attenuated path was still found to be non-commercial. And in Bosley, the Ninth Circuit said that this was not a Lanham Act violation. Likewise, the Tenth Circuit and Utah Lighthouse ruled that using an instrumentality of interstate commerce, even if that is use in commerce, does not mean such use is necessarily commercial for the purposes of the Lanham Act. The Lanham Act's text and purposes circumscribe its reach to commercial uses of a trademark and aims to protect consumers who have formed particular associations with a mark from buying a competing product using the same or substantially similar mark and to allow the markholder to distinguish his product from that of his rival's. Now, along these same lines, the Fourth Circuit in the Radiance Foundation case, which the site is 786 Fayette 3rd 316, reasoned that an actionable trademark claim does not simply require the alleged infringer use, in commas, the mark that the trademark holder possesses. It also requires that the infringer's use be in connection with goods or services in a manner that is likely to cause confusion among consumers as to the goods and services source or sponsorship. Thus, for liability to attach, a defendant must use a mark in connection with the goods or services of a competing producer. Now, there's undisputed evidence established that HISD did not make commercial use of appellant's marks and HISD merely provided information about its summer reading program both online through its website and brochures that were shared with the parents. There was nothing offered for sale with regard to its reading program. And moreover, the appellant cited no evidence that HISD solicited funds over the Internet. Now, appellant misplaces its reliance on acquisition of goods, as we were talking about from a third party, and then passing those items to incentivize students to read. Now, the schools that were part of the program for HISD, what was handed out to the students were things that were printed in the HISD print shop internal. There were certificates, T-shirts, and bracelets. The only things that were purchased from Augusta were banners that they could not print inside the print shop. And there were five of them that were purchased. They did not include Springboard's marks. It included Houston ISD Millionaire Club Summer Reading Program. That was the exact mark that was on those banners. That is not the mark for which Springboard's owns or has a registration for, because their marks are simply Read a Million Words, Millionaire Reader, Millionaire's Reading Club, and Million Dollar Reader. Now, there were certain items that were donated to the schools and by local organizations that wanted to support HISD's Summer Reading Program. All of those items were given away. HISD absorbed all of the program costs related with its Summer Reading Program, which was only over the summer period when school was out, and it was in place to help prevent the summer slide. The Director of Library Services at that time said, look, in the district we have 200,000 students. Research shows that if the students read five books over the summer period, it would help prevent the summer slide, and that is how they came up with the HISD Millionaire Club, because they wanted the students to read a total of a million books. That's how we got here. Now, none of HISD's announcements about its program had a commercial component at all. Things were sent home with the students right before school let out to tell them, look, we have a Summer Reading Program that we want you to engage in, because we have, through research, understand that this can help prevent the summer slide. You can check out the books from the Houston Public Library. That was what was done and sent out to the students, to their parents. Now, Appellant resorts to speculation concerning HISD's purported use of its marks to improve HISD's reputation and to obtain additional funding. All of the funding for HISD as a public school entity comes from the Houston Public Library. They engage in the Summer Reading Program to somehow bolster HISD's reputation, such that it can get more funding from the state of Texas. Does the record show, at what point in time did HISD become aware of the mark of Springboard in terms of HISD's sort of processes? I mean, I assume at some point in time HISD did become aware that there was the millionaire mark. Can you help me understand when that was and how, if at all, that factored into anything, or was it the lawsuit itself? Your Honor, that came about at the time that the suit was filed. During the depositions, which I personally attended, where they deposed the teachers, none of the teachers, none of the library services people were aware of Springboard's or its marks at any time. And that is supported in the record. What about counterfeiting? Didn't they bring a counterfeiting claim under the Lanham Act? They did bring up a counterfeiting claim. Again, there was no evidence in the record that supported a counterfeiting claim, but a counterfeiting claim would have to be exact in order to be counterfeiting. The HISD mark is nowhere near Springboard's mark at all. So there could not be a counterfeiting claim. Thus, we had no evidence in the record regarding counterfeiting. And I assume that was waived because they made no, there's nothing in the record supporting it, there's nothing on appeal about the counterfeiting at all. They raised it there briefly in their brief. They raised it briefly in their brief, but they raised it in the summary judgment. When we moved for summary judgment, Judge Hittner decided the case on the lack of commercial use on the Lanham Act. We also moved on all of the claims that they had. There was a state-taking claim as well, but Judge Hittner decided the case on the lack of commercial use, which didn't support the Lanham Act claim as well. As far as the counterfeit claim, again, the only way it could be a counterfeit is if it's an exact copy of it. Now, what I will do is I will rest on the fact in our briefs regarding the abuse of discretion arguments, because in those arguments, those were specific instances where they moved for relief to the court to get an extension of time on the summary judgment briefing period. They also moved for a relief of time to supplement their summary judgment brief after they had already filed it. They also moved the court to file a second amended complaint, and it was only non-substantive clarifications that they wanted to make, and that's all under the abuse of discretion. The court only needed to be reasonable about its ruling in the court's opinions, which are part of the record. It's very reasonable. The court walked through all of the factors and its lack of showing of good cause. Simply put, there's nothing questionable about the way that the court was controlling its docket in trying to push the case along. All right, let me ask you this. Assuming for the sake of this question that the commercial use aspect, which is what you said the district court ruled on, as you know, we can affirm for any basis the record allows or format a law. Assume for the purpose of this question that we were at least unsure or whatever about the commercial use piece. So what, from HIST's viewpoint, is an additional ground, if any? Or does the case turn on whether we agree about the commercial use part? You heard earlier the discussion about the confusion aspect, but is there a rise or fall on the commercial use? No. It does not, Your Honor. In fact, my third point that I wanted to get to is the alternative grounds for affirmance of the lower court's ruling. Now, if Pellant failed to acknowledge or adequately brief HIST's numerous alternative grounds for summary judgment, and these other grounds support affirmance, and consistent with this court's holding in Reed v. Neal Post, the court can affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court. Now, Pellant failed to raise a genuine issue or material fact regarding likelihood of confusion. Now, likelihood of confusion is indispensable to Appellant's claims of trademark infringement and false designation of origin, yet the Appellant scarcely mentions that at all. There are several factors that inform that analysis. One, the strength of the plaintiff's mark. Two, the similarity of design between the marks. Three, similarity of the products. Four, identity of retail outlets and purchasers. Five, similarity of advertising media used. Six, the defendant's intent. Seven, actual confusion. And eight, the degree of care exercised by potential purchasers. Now, turning to the first factor, Appellant's marks are commercially weak because the evidence of record established a lack of commercial recognition. Appellant has one customer in its hometown that comprises 87% of its historical revenue in Edinburgh, Texas. One customer comprising 87% of its historical revenue. With regard to factor two, the mark. How much revenue is there of the other 13%? I'm sorry, Your Honor? About the other 13%, is it a lot of revenue? What are we talking about here, just in magnitude? I don't know if the magnitude of the 13%, but that 87% was the Edinburgh ISD, and that is the largest customer that they have by far. We're talking about thousands of dollars of sales, hundreds of thousands. The record shows that I think the most was about $200,000 in sales historically. From the whole operation? With regard to factor two, the marks are dissimilar. Appellant focuses on HISD, use of the words millionaire or club. That's an opposite for determining similarity, because the evidence of the record established that HISD consistently used the additional and unique identifier Houston ISD in conjunction with millionaire club, which undercuts any superficial similarities between the marks. Appellant does not have a registered mark for millionaire club. That is not at issue here, because they do not have a registered mark for that. Now, the products and services are dissimilar. Appellant presented no competent evidence addressing the third factor, that is, the similarity of designs and the similarity of items bearing those marks. The fourth factor, the outlets and audiences are dissimilar. There's no evidence in the record that HISD targeted any purchases in its program that was internal to HISD and was not offered to any other school districts or schools. In contrast, appellant targets schools and school districts and not students. I will skip down to the sixth factor. There's no evidence in the record that HISD intended to derive benefits from appellant's reputation. In fact, the evidence is opposite, because HISD personnel involved in the Houston ISD millionaire club had no knowledge about appellant or its marks. So the library services which created this summer reading program, nobody, when they were deposed, had no knowledge of them. And the last thing I will hone in on as my time expires is factor seven, because it's important that no consumers were actually confused. Appellant failed to show any actual confusion. Instead, it relied on declarations of third party witnesses that should have been disregarded because they came in after the close of discovery, and we never had a chance to depose those individuals. So they submitted these during summary judgment, and those declarations were not cited to substantiate actual confusion, but rather solely to support the reputation of appellant's marks. Now, the declarants did say that they were familiar with appellant's products and services and that they were confused upon encountering HISD's program, but none of the declarations say that they were actual consumers of any of the products. So you can't show that there is actual confusion of a consumer if they were not consumers of the products. And I will rest with saying that, in closing, that HISD respectfully requests that this Court affirm the lower court's judgment on appellant's Lanham Act claims and also assert that this Court would have to look no further than the lack of likelihood of confusion as an alternative ground for affirmance of the lower court's judgment. Thank you. Back to you, Mr. Dabigal. Just a few points I'd like to have a rebuttal on. And I like the or actually to counter HISD's argument on saying that they just put HISD in front of our trademark to change. I mean, is it okay, then, to put HISD Coca-Cola on your products and give it away? Is that still infringement? Regardless, it's a, you know, and that really goes to confusion, which itself, there's a lot of factors that are involved, and not all of those are one single issue that you've got to account them all to see what confusion is. And it's usually referred to a jury. There was also three depositions taken after discovery because of Hurricane Katrina. Now, I wasn't going to go too much into the denial of our updated motion for summary judgment because that's an abuse of discretion review, and I know that's kind of hard to overcome. But in those circumstances, I know at least one of our depositions was interrupted by Katrina, and so we had to reschedule it later. And then there was two others that the judge allowed after discovery was done, but because of Hurricane Katrina. And then he didn't allow us to update the summary judgment with any of that evidence. Excuse me? This case goes back before Katrina? I'm sorry. It was, no, it's the one in Houston. Katrina was here. Harvey. Harvey. Yes, I'm sorry. Harvey, yeah. I was stuck here in New Orleans, and we were talking about Katrina and Hurricane Harvey in Houston. As you all know, last September, that was pretty horrific. And it did cause HISD a lot of budget deficits, too, and I know that is part. But anyway, so that's the only part that I wanted to bring in about the extra evidence that we would be able to bring in to trial. And contrary to Mr. Spivey's argument, we do have teachers admitted in depositions. They work closely with our client or work closely in the conferences and knew about our client's marks. And we also have, I know, they did attend some of the conferences. They did know about it. And like I said, adding HISD to the beginning of it doesn't change the confusion part. It's just a factor of it. How does your client define its market? Is it regional, geographical, to certain kinds of? No, they go to a lot of the regional conferences, but they also go to some national ones. I know they went to one in Chicago that I'm sure some of the students go to. And there's actually quite a few in Texas that the students themselves love to go to because our client usually does a lot of, with Disney characters, of course, we get authorization from Disney to do that. And it's a big party for the kids. They just love it. And there's also limousines involved and we become a millionaire, get the big celebrations and stuff like that. Where's the other 13% of the market? I don't know. Do you know how many dollars are involved? I'm sure I do, but I don't, not off the top of my head. Really, we came to argue was the factor of commercial use and how it applies to ISDs. And ISDs are not excluded or exempt from commercial use. What's your best case that says this is commercial use? Excuse me? What is your best case that says what happened here is commercial use? Well, all the cases do. None exactly are on point. That's what I was asking. Do you have one exactly on point? Yeah, there is none exactly on point for an ISD. But all the ones that are against nonprofits that say nonprofits don't infringe is because of the activities. Like I said, parody doesn't count. Criticism doesn't count. Describing somebody's services doesn't count because you're not selling or offering. The opponent really focused on selling because they didn't sell it. That's not the only reason you can infringe. If you're distributing the products, you're giving them away. Are there cases that focus on distribution standards? Yes. What are they? Gosh, you guys right here. Which one is it? Gosh, which one? I'm sorry. Oh, Bertulli. Bertulli USA versus Philippine 662FSUP203, Southern District of New York City or New York, 1987. Basically they were not selling the product itself. That's all right. I'll go read it. You've got a red light now. Thank you very much. I greatly appreciate the time that you gave us. Thank you. Thank you to you and this is probably for your briefing and argument in the case. It will be submitted along with the balance of the cases we heard today. The panel will stand in recess until 9 a.m. tomorrow.